OPINION
This is an appeal from a summary judgment for an employer on a terminated former employee's claims for handicap discrimination and retaliation.
Rita Eisman had been employed for a number of years by the Clark County Department of Human Services ("DHS"), most recently as a full time Social Services Worker, when in 1990 she requested and was granted a six-month medical leave of absence. Eisman had been beset with several serious health problems, including Marfan's Syndrome, a connective tissue disorder, and diabetes. At the conclusion of the leave of absence period DHS granted Eisman's request for a temporary separation for health reasons. Under the terms of the separation, she had a right to reinstate in her former position within three years.
Eisman returned to work at DHS in 1993. She was able to work only twenty hours per week because of her health problems. She was therefore assigned to work ordinarily performed by new employees, not to her former position.
Eisman was subsequently injured in an automobile accident and required more time off. She returned to work part-time. In 1995, Eisman requested further medical leave due to job-related and emotional distress.
DHS referred Eisman to a physician, Dr. Southworth, who opined that Eisman could work but twenty hours per week, if at all. Eisman's personal physician, Dr. Cass, agreed, and added that Eisman's stress resulted from "interaction with her supervisor, her co-workers, and her frustrations at being placed in a training unit despite her many years of service."
Eisman filed a charge of handicap and disability discrimination with the Ohio Civil Rights Commission and the Federal Equal Employment Opportunity Commission in 1995. After conciliation proceedings, Eisman and DHS agreed to a five-point plan. DHS agreed that it would, among other things: (1) allow Eisman to return to work as an SSW3 in the Intake Unit of the Social Services Division for 30 hours per week for 120 days, after which, she would resume working full-time; (2) reassign Eisman to her chosen supervisor, Ann Mills; (3) evaluate Eisman's progress through her supervisor and her physician at 60, 90 and 120 days after she started working; (4) allow Eisman to have the first two weeks of her return as down time; and (5) assign Eisman 75% of the caseload of a typical case worker.
When Eisman returned to work it was agreed that the meetings to discuss her progress would take place on September, 14, 1995; October 16, 1995; and November 13, 1995. The first two meetings occurred as scheduled, and revealed that Eisman was working an average of less than the thirty hours a week she had agreed to work. Eisman failed to attend the Monday, November 13, 1995 meeting. Eisman claims that the meeting had been rescheduled to November 14, 1995. (Eisman depo. 202-203). However, she failed to attend work on Tuesday, November 14, 1995, and the remainder of the week.
On November 14, 1995, DHS sent a letter to Eisman informing her that it intended to hold a disability separation hearing on November 17, 1995. This letter was also placed in her employee mailbox.
Eisman failed to attend the November 17 separation hearing. She claims that she did not receive notice of the meeting until after it was held. However, approximately one hour prior to the scheduled meeting DHS received a facsimile from Dr. Mary Fontana, Eisman's cardiac care physician. The letter stated:
 "Rita has been experiencing blood pressure and blood sugar problems. She is continuing to state to me that her stress on the job is coming from the administration and not from the performance of her duties.
 "Due to the nature of Rita [Eisman's] medical condition, with difficulty controlling her blood pressure and blood sugars, I feel Rita should not return to work until further notice."
DHS conducted the November 17 disability separation meeting without Eisman, and then completed the paperwork necessary to institute an involuntary disability separation. On November 21, 1995, four days after the hearing, Eisman requested that the hearing be rescheduled. DHS denied this request, and informed her in a November 21, 1995 letter from DHS Director, Robert B. Suver, that the letter from Dr. Fontana and Eisman's failure to appear left the agency no choice but to separate her from her employment. The letter also stated: "Should your medical condition change and you wish to exercise reinstatement rights, please contact Dr. Martycz." Eisman never filed an administrative appeal from her discharge claiming that her failure to receive notice of the November 17 separation hearing rendered her resulting termination improper.
On November 14, 1997, Eisman commenced an action alleging age discrimination, handicap discrimination and intentional infliction of emotional distress. The trial court granted DHS's motion for summary judgment on all claims for relief. Eisman appeals and presents one assignment of error.
 "THE TRIAL COURT ERRED BY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT."
Summary judgment may not be granted unless the entire record demonstrates that there is no genuine issue of material fact and that the moving party is, on that record, entitled to judgment as a matter of law. Civ.R. 56. The burden of showing that no genuine issue of material fact exists is on the moving party. Harless v. Willis Day WarehousingCo. (1978), 54 Ohio St.2d 64.
All evidence submitted in connection with a motion for summary judgment must be construed most strongly in favor of the party against whom the motion is made. Morris v. First National Bank Trust Co. (1970),21 Ohio St.2d 25. "Because a trial court's determination of summary judgment concerns a question of law, we apply the same standard as the trial court in our review of its disposition of the motion; in other words, our review is de novo." Am. States Ins. Co. v. Guillermin (1996),108 Ohio App.3d 547, 552.
Eisman argues that the issue of whether she presented a prima facie case of disability discrimination and whether she made out a prima facie case of retaliation present genuine issues of material fact.
 DISABILITY DISCRIMINATION
A plaintiff who alleges disability discrimination must present prima facie evidence of the claim. To establish a prima facie case of disability discrimination, a plaintiff must show (1) that she is handicapped, (2) that an adverse employment action was taken by an employer, at least in part, because she is handicapped, and (3) that, though handicapped, she can safely and substantially perform the essential functions of the job with reasonable accommodation. Hood v.Diamond Products (1996), 74 Ohio St.3d 298, paragraph 1 of syllabus.
The trial court found against Eisman on the third prong of the prima facie case requirements because of "her inability to safely and substantially perform the essential functions of her job, with or without reasonable accommodations." It found that from July 1995 to November 1995, DHS made several reasonable accommodations to assist Eisman in performing the essential functions of her job. Some of the accommodations found by the trial court included giving Eisman a new supervisor, giving her a handicap parking space, reducing her workload, and allowing her to work part-time with a gradual increase back to a full-time schedule. Eisman admitted in her deposition that she was unable to work for a two-year period beginning in November of 1995.
Eisman argues that she could perform the duties of the original position with or without accommodation. She points to the testimony of DHS's Human Resource Director, Virginia Martycz, who stated that from the time Eisman returned to work in July 1995 until her termination by DHS, Eisman could perform all of the essential functions of a social services worker, but that she could not do them on a forty hour a week basis. (Martycz depo. 56-57). Eisman further argues that Dr. Fontana's November 17, 1995 fax stated merely that she should not work until further notice, and does not demonstrate that she was permanently disabled.
Eisman also argues that DHS failed to reasonably accommodate her disability. She argues that the trial court was incorrect when it found that DHS had made several reasonable accommodations to her between July 1995 and November 1995. Eisman argues that DHS should have accommodated her by allowing her to continue working 30 hours per week rather than the involuntarily separating her.
"Federal courts have recognized that the duty of an employer to make a reasonable accommodation also mandates that the employer interact with an employee in a good faith effort to seek a reasonable accommodation."Shaver v. Wolske Blue (2000) 38 Ohio App.3d 653. "To show that an employer failed to participate in the interactive process, a disabled employee must demonstrate: 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith." Id., at 664 (quoting Taylor v. Phoenixville School Dist.
(C.A.3, 1999), 184 F.3d 296, 306.) (citations omitted).
The conciliation agreement between DHS and Eisman was a reasonable accommodation. O.A.C. 4112-5-08. Eisman's signing of the agreement shows that she also believed it to be reasonable. In accordance with the agreement, from July 1995 to November 1995, DHS permitted Eisman to work 30 hours per week so she could build up her stamina and resume working full-time again. DHS provided her with a handicapped parking space. It also gave Eisman a workload of only seventy-five percent of what other employees in her position were performing. Additionally, DHS assigned Eisman to the supervisor of her choice.
Eisman failed to attend both the one hundred twenty day review meeting and the involuntary disability separation meeting. Additionally, on November 17, 1995 approximately one hour before the scheduled involuntary disability separation hearing, DHS received a letter from Eisman's cardiac physician which stated that she believed that Eisman "should not return to work until further notice."
In her deposition, Eisman testified that in 1997, two years after her termination, it became clear to her, her physicians and her counselors that she could perform work again. (Eisman depo. 112-114). However, neither Dr. Fontana, nor any other medical practitioner released Eisman to perform full-time or part-time work for any employer after her November 1995 termination. In her deposition, Dr. Fontana testifies that in April 1996 she still considered Eisman totally disabled. (Fontana depo. 57).
Eisman has failed to provide any evidence that she was capable of substantially performing the essential functions of her job, with or without reasonable accommodation. She was terminated by DHS in November of 1995 because she was then unable to work. She does not contend that she was then able to work, even with some form of accommodation. She argues merely that DHS should have drawn its conclusion differently. Eisman made no claim in that respect when she was discharged. At that time, no one knew when she might be able to return to work, if ever. If an employee is incapable of working at all, there is no accommodation an employer can make to permit her to work.
Because Eisman failed to present a prima facie case of handicap discrimination, the trial court did not err when it granted DHS's motion for summary judgement on that claim for relief.
 RETALIATION
Eisman claims that her termination by DHS was in retaliation for her complaints to the Ohio Civil Rights Commission and the Federal Equal Employment Opportunities Commission concerning DHS. To establish a claim of retaliatory discharge, a plaintiff must show (1) she engaged in protected activity; (2) the employer knew of her participation in the protected activity; (3) the employer took adverse action against her; and (4) a causal link existed between the protected activity and the adverse action. Chandler v. Empire Chem., Inc. (1994), 99 Ohio App.3d 396. Once a plaintiff successfully establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate reason for its action. Id. If the defendant carries out that burden, the burden then shifts back to the plaintiff to show that the articulated reason was merely a pretext. Id.
The trial court granted summary judgment to DHS on a finding that DHS took no adverse action against Eisman, and that even if did there was no causal connection between the claims Eisman filed with government agencies.
Eisman has proved the first two elements of her claim of retaliatory discharge. Her filing of the complaints was clearly a protected activity. Additionally, her employer was aware of the filings. As to the third element, even DHS agrees that an involuntary disability separation constitutes an adverse action against Eisman. This leaves the fourth element, the required causal connection.
To establish a causal connection between an employee's protected conduct and an adverse action by an employer, an employee must produce evidence "sufficient to raise the inference that [her] protected activity was the likely reason for the adverse action." Zanders v. Nationall R.R.Passenger Co. (6th Cir. 1990), 898 F.2d 1127, 1135. In other words, some nexus must be demonstrated by the evidence, not merely suggested by the proximity of the events.
Eisman argues that there was a causal relationship between her protected conduct and her separation. Specifically, she points to a conversation she had with Kevin Sellards, Clark County Personnel Director, wherein Sellards allegedly threatened her about the consequences of filing these complaints. The alleged incident occurred when Eisman visited Sellards' office in an attempt to track down a missing paycheck. (T. 146-47). She testified:
 "Q: Okay. What sort of threat, how did he threaten — what did he threaten you with?
 "A: He shook his finger in my face and leaned up across his desk and talked very loud with animosity, anger on his face.
"Q: Did he indicate —
"A: He said I should not file an EEOC.
"Q: Did he tell you what would happen if you did?
 "A: He did not say. As I recall, what would happen, he left that kind of hanging, but made a statement to some effect that I would be sorry." (T. 164).
Eisman's argument relies on Conklin v. Lovely (6th Cir. 1987), 843 F.2d 543, wherein the court held that a comment to the effect that "paybacks are hell" presented evidence of a causal connection. She argues that Sellards' threat is analogous.
Eisman also argues that there was a good faith misunderstanding as to the scheduled November 13, 1995, 120 day assessment meeting. She argues that she thought the meeting was to occur on November 14, 1995, and that her calendar shows that the meeting was changed to the following week. (Eisman Depo. 202; Appellant's Reply Brief at 12.) Further, Eisman argues that the three days between that date and her disability hearing set for November 17, 1995 was proof of wrongdoing by DHS. She also argues that she never received notice of the meeting because the letter sent to her home only arrived after the meeting was over.
The evidence of Sellards' statements might demonstrate a causal connection between Eisman's having initiated the discrimination charges and her subsequent involuntary disability separation. However, there is an abundance of independent evidence that supports a finding that the DHS decision to involuntarily separate Eisman was for other, legitimate reasons.
Eisman failed to attend the November 13, 1995 120 day review meeting. This meeting had been agreed to in the Negotiated Settlement Agreement, and the specific dates and times were memorialized in a July 19, 1995 letter from DHS's personnel director, Virginia Martycz. Eisman claims that she did not attend the November 13 meeting because it was moved to November 14. However, Eisman failed to attend work on November 14. Had she done so, she would have had ample opportunity to remedy any potential miscommunication. Instead, Eisman failed to attend work the entire week, and while she did call on November 15 and leave a message with a clerical employee saying she would not be in for a while, she never bothered to explain her absence to her supervisor or the administration of DHS.
DHS committed no wrongdoing in scheduling the separation meeting so soon after the November 13 meeting. DHS originally held a pre-separation hearing to place Eisman on involuntary disability separation on April 4, 1995. The separation process was put on hold when the conciliation agreement was signed. The agreement gave DHS an opportunity to monitor Eisman's ability to perform the job over the four-month period and to allowed Eisman a chance to build up her strength so she could return to working the required full-time forty hour work week. It would seem logical for DHS to schedule Eisman's involuntary disability separation hearing soon after the conclusion of the four-month period called for in the conciliation agreement. The four-month period gave DHS an opportunity to monitor Eisman's ability to perform her job and her health. Prompt action after that was appropriate.
DHS provided Eisman notice of the involuntary disability separation meeting by certified mail sent on November 14, 1995. Additionally, a copy of the letter was delivered to Eisman's employee mailbox on November 14, 1995. Eisman claims she didn't get the letter. However, Dr. Fontana, her physician, managed to fax a letter to DHS an hour before the involuntary disability separation meeting, suggesting that Eisman was aware of it. Had Eisman attended work that week, or even communicated with DHS, DHS could have informed her in person of the meeting and any mix-up with mailing would have been inconsequential and avoidable.
Eisman could have filed an administrative appeal regarding this alleged failure of notice. However, she chose not to do that. Eisman cannot now claim that her discharge was a form of retaliation because of the procedure that was employed when she failed to avail herself of an available administrative remedy concerning the defect involved.
In her deposition, Eisman admits that she was incapable of working for two years following her involuntary separation. (Eisman depo. 212) A plaintiff who cannot attend work cannot perform the essential functions of her employment. Shirey v. Pepperidge Farms Inc. (N.D.Ohio. 2002), 2002 U.S. Dist. LEXIS 18872. So any failure of notice of the separation hearing was harmless.
DHS reasonably relied on the letter faxed to them from Eisman's doctor, which stated that she was not able to work until further notice. Eisman does not dispute the doctor's finding that she could not work. DHS's inference that Eisman was incapable of working was reasonable, considering that Dr. Fontana's fax was the only information Eisman provided DHS in connection with the separation hearing.
Taken together, these facts provide a legitimate reason for DHS's decision to involuntarily separate Eisman, and no genuine issue of material fact exists concerning them. The existence of a legitimate reason to terminate an employee trumps the employee's showing of other reasons to find that the termination was in retaliation for the employee's exercise of some protected right. Chandler, supra. Therefore, the assignment of error is overruled, and we will affirm the trial court's order in granting DHS's motion for summary judgment.
WOLFF, P.J. and FAIN, J., concur.